UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOM MARK FRANKS,<br><br>　　　　　Petitioner,<br><br>　v.<br><br>M.E. SPEARMAN,<br><br>　　　　　Respondent. | Case No. 1:18-cv-00385-DAD-JDP<br><br>FINDINGS AND RECOMMENDATIONS THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED<br><br>ECF NO. 1 |

Petitioner Tom Mark Franks, a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner contends that his trial counsel provided ineffective assistance. However, he has not shown that he suffered prejudice as a result of his counsel's alleged errors. We therefore recommend that the court deny the petition.

**I.　Background**

Petitioner is incarcerated pursuant to the judgment of the Stanislaus County Superior Court, Case No. 1444611. A jury acquitted petitioner of second-degree murder for the death of Jacqueline Miller but convicted him of the lesser included offense of voluntary manslaughter and found applicable the firearm-use enhancement. The trial court sentenced petitioner to an aggregate term of thirty-nine years in prison.

We set forth below the facts of the underlying offenses, as stated by the California Court of Appeal, Fifth District ("Court of Appeal"). A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

**A. The shooting.**

On May 4, 2012, Jacqueline (Dotty) Millan was shot in her head. The shooting occurred near a house on Vernon Avenue in Modesto which Jacqueline was renovating with appellant. There was no evidence of gun powder around Jacqueline's wound, indicating it was not a close-range shot. There was no exit wound. The bullet wound was approximately one centimeter in size. The bullet struck her skull and shattered into several pieces, making it impossible to determine its caliber. Based on the size of the entry wound, a deputy believed a small handgun could have been used to shoot her. She was declared brain dead on May 7, 2012.

**B. The neighbor's testimony.**

Floriberto Aguilar saw Jacqueline in the early evening of the shooting. She was walking towards the Vernon house, which was two houses from his residence. Aguilar went inside his residence and opened a window. He could hear Jacqueline arguing with appellant, recognizing their voices from past encounters. Jacqueline was accusing appellant of cheating on her. Aguilar knew appellant was Jacqueline's boyfriend. The arguing lasted 20 or 30 minutes. He called 911 when it intensified.

After calling authorities, Aguilar poked his head out his window. It was dark outside. He saw Jacqueline's silhouette as she stood outside, and he did not see anyone else. He pulled his head back inside and continued to hear Jacqueline arguing with appellant. After some time, appellant was quiet for three to five minutes. At some point Aguilar saw a "tall, skinny male" run out of a nearby alley. This person turned and ran down the street in Jacqueline's general direction. Aguilar did not believe the skinny male was appellant. Aguilar then heard three shots and sounds of someone running away. He described the shots as if coming from "a little toy cap gun" which made a "popping noise." Aguilar called 911 again and reported the shots fired. He looked out his window and saw two vehicles parked in the street. Aguilar could see a man was in one of the vehicles. Aguilar exited his house and found Jacqueline lying on the ground, severely injured but still conscious.

**C. Appellant's initial statements.**

Sheriff's deputies arrived at the shooting scene at approximately 10:00 p.m. and conducted a search of the area. Later

2

that night, deputies established a perimeter around the Vernon house. Following commands from deputies, appellant exited the rear of that house. He was taken into custody and transported to a sheriff's station. Sometime after 11:25 p.m. that night, a deputy administered a gunshot residue test on appellant's hands which was negative. The lack of gunshot residue either indicated appellant did not fire a gun, he fired a gun but no particles were deposited on the areas which were sampled for testing, he fired a gun and no residue was left on his hands, or any deposited residue was removed by the time the samples were collected.

Deputies conducted a general search around the crime scene, and searched the Vernon residence and a neighboring storage shed. No gun or ammunition was located. No spent shell casings were located. In the shed, a gun holster was located, which appeared very worn. The holster was designed to hold a compact-sized gun, possibly having a two- or three-inch barrel. Deputies were unable to search a burned-out detached garage located at the Vernon house due to its structural unsoundness. Deputies also did not search two septic tanks on the property which were not sealed but were covered with plywood. Based on the covering, a deputy opined at trial that someone could have tossed something into a septic tank.

At the sheriff's office, appellant told deputies he had been sleeping in the Vernon house when the shooting occurred. He said he had been at Jacqueline's residence earlier in the evening, identifying himself as her "off and on" boyfriend of 27 years, and her live-in boyfriend over the last year. He denied arguing with Jacqueline that night and said he was asleep when any arguing occurred. He said he was oblivious to what happened outside. He claimed to have not heard any of the shots, sirens or noises. Appellant then said he had an earlier argument with Jacqueline that day at another location, and he had been drinking earlier. He claimed to have gone to the Vernon house alone and passed out from too much alcohol.

When shown the gun holster from the shed, appellant said he did not know anything about it and claimed somebody was setting him up. He later admitted that everything in the shed belonged to him. He opined it was Steve Millan, Jacqueline's estranged husband, who hurt Jacqueline. Appellant was confronted with Aguilar's statements that appellant was heard arguing with Jacqueline before the shots. Appellant continued to deny having any argument with her outside the Vernon house. He showed very little emotion upon hearing that Jacqueline was not doing well and would probably not live.

**D. Appellant changes his story.**

Several days later, after being placed into jail, appellant asked to speak again with a deputy. In the subsequent interview, appellant changed his story regarding the night of the shooting. He said he returned to the Vernon house and Jacqueline arrived shortly

3

thereafter, banging on the door. She accused him of having an affair and cheating on her. The argument escalated and became physical. He said Jacqueline swung at him on the front porch. He gave her a bear hug and they moved to the front yard. He said "all of a sudden a gun comes out of nowhere." He had no idea where the gun came from. A single shot occurred. He let go of Jacqueline, walked back inside the Vernon house and fell asleep. He said he did not check on Jacqueline's well-being because he was in shock, blacked out, and did not know what happened. When asked why he lied during his first interview, appellant said he did not know, he was in shock, and he did not know what occurred.

### E. Evidence of appellant's prior acts committed against Jacqueline.

The son of Steve and Jacqueline, Aaron Millan, told the jury that appellant and Jacqueline argued a lot. Aaron recalled a fishing trip during which appellant and Jacqueline got into an argument, and appellant pushed her. Police were called and she complained about her chest hurting.

On another day in April 2012, appellant and Jacqueline had an argument and he tried to set fire to an attic of a house they were renovating. Appellant lit newspaper and began to climb a ladder to the attic. Aaron knocked the newspaper from appellant's hand, and the argument continued. Appellant left the area. Jacqueline complained of chest pain and she showed Aaron a handprint on her chest, which Aaron photographed. Later that night, appellant went to Jacqueline's residence and began yelling outside. Appellant held a brick in his hand, which he threw at Jacqueline's front door, causing some damage.

On another day, Aaron witnessed appellant burning a pile of clothes in their backyard. Aaron also knew the garage at the Vernon house caught on fire when Aaron and Jacqueline were not there.

April Rodrigues, a friend of Jacqueline, recalled an incident when appellant and Jacqueline got into an argument. Appellant started swinging at Jacqueline, who swung back. Rodrigues described him as "going nutty" and he hit and kicked at Jacqueline. Appellant said he was going to kill Jacqueline, called her a stupid bitch, and told Rodrigues to get out of the way or he would hit her. Appellant left before police arrived.

### F. Arson investigation.

On April 8, 2012, fire captain and arson investigator Alfonso Zamora investigated a fire to the garage at 1605 Vernon Avenue in Modesto. He determined arson was the cause. He interviewed Jacqueline at her residence. Zamora saw articles of burnt clothing in the driveway. Zamora also interviewed appellant, who said Jacqueline burnt the clothes because she was mad at him

4

for cheating on her. Appellant denied any knowledge of the garage fire at the Vernon house and denied starting it. Appellant, however, admitted to Zamora that the night before the garage fire occurred, appellant had lit a piece of paper on fire, but denied trying to burn anything down.

### G. Steve Millan's whereabouts during the shooting.

Aaron testified he was home with Jacqueline on the day she was shot. Aaron testified that his father, Steve, was not home that day and had not been home for a while.

Steve testified he and Jacqueline had been married for 13 years but they were separated. Steve believed Jacqueline knew their relationship was over. He denied ever being violent towards her, and said he does not own a gun. He worked as a long-haul truck driver and was not home for long periods of time. He testified he had been away for approximately three months when the shooting occurred. He was off-duty from work from April 30 through May 4, 2012. On the day of the shooting, he testified he was in Ontario, California, staying in his truck. Evidence was introduced at trial showing he made a cash transaction in Ontario, California on the day of Jacqueline's shooting.

Steve became aware of appellant approximately eight months before Jacqueline's death. Steve knew Jacqueline was having an affair with appellant. In December, before the shooting, Steve spoke with appellant on the telephone. Appellant threatened to blow up Steve's truck, burn down Steve's house, and "torch the cars."

ECF No. 14-10 at 2-7.

## II. Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). In a § 2254 proceeding, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard that governs the federal court's habeas review depends on whether the state court decided petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of § 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). One rule applies to all state prisoners' petitions decided on the merits: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a § 2254 petitioner still must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under § 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

6

If a state court denies a petitioner's habeas claim solely on a procedural ground, then § 2254(d)'s deferential standard does not apply. *See Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016). However, if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has explained, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). The federal court's habeas review serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner raises two habeas claims[1]: (1) petitioner received ineffective assistance of counsel because his trial counsel failed "to investigate the [plausible] defense theory that the husband Steve committed the murder or had it done"; and (2) petitioner received ineffective assistance of counsel because his trial counsel "failed to investigate, as he promised the Judge he would in a [*Marsden*] Motion, my suicide attempt and how it related to my last police interview." ECF No. 1 at 23. The Stanislaus County Superior Court rejected both claims on the merits in a

---

[1] As a basis to support his ineffective assistance claims, petitioner states that "the evidence was weak." ECF No. 1 at 5. This conclusory statement is insufficiently developed to constitute a stand-alone sufficiency-of-the-evidence claim. *See* Habeas R. 2 (providing that the petition must "specify all grounds for relief available to the petitioner," "state the facts supporting each ground," "state the relief requested," and "be signed under penalty of perjury," among other requirements); *Ind. Towers of Washington v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003) (holding that bare assertion of an issue does not preserve a claim; "We require contentions to be accompanied by reasons.").

reasoned opinion.[2] ECF No. 14-12. The Court of Appeal and the California Supreme Court summarily denied review. ECF No. 14-14; ECF No. 14-16.

Both claims of ineffective assistance of counsel are governed by the same standard: A "doubly" deferential standard governs a habeas petitioner's claim of ineffective assistance of counsel. *See Richter*, 562 U.S. at 105. On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim. *See* 466 U.S. 668, 687 (1984). Under *Strickland*, a criminal defendant first must show a deficiency in performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that the deficient performance caused him prejudice; this requires him to show "that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. On habeas review, the *Strickland* requirements become even more deferential since they are coupled with § 2254(d)'s fairminded jurist standard: the question becomes "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even one reasonable argument that counsel did not violate the *Strickland* standard— even if the state court has not identified the argument—the petitioner cannot obtain habeas relief. *See id*. at 106.

### a. Failure to Investigate the Victim's Husband

Petitioner argues that his trial attorney's failure to investigate the theory that the victim's husband committed the murder constituted ineffective assistance of counsel. Petitioner alleges that the husband "had motive, opportunity, no alibi, phone records showing an argument [with the victim], and a [neighbor] friend of his spying on the lovers for him." ECF No. 1 at 23. Petitioner further alleges that his attorney commenced investigations into the husband—such as drafting a subpoena for the husband's phone records and looking into whether the husband had a gun—but

---

[2] The superior court also found that the claims were procedurally defaulted. ECF No. 14-12. Assuming petitioner could not meet one of the exceptions excusing procedural default, federal review would have therefore been precluded. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). However, procedural default is an affirmative defense, *see Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003), and defendant failed to raise it here, resulting in waiver, *see Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003).

8

ultimately failed to obtain this evidence, depriving petitioner of support for a third-party-culpability theory. *Id.*

Petitioner's argument fails to meet the exacting *Richter* standard. Even if petitioner could satisfy *Strickland*'s performance prong—a dubious proposition given its low bar—he patently fails to establish prejudice. As stated in the summary of facts, evidence at trial demonstrated that the victim's husband was out of town when the victim died. Thus, even if defense counsel investigated whether the husband owned a gun or subpoenaed his telephone records, such information would have provided little support for petitioner's theory.

### b. Failure to Investigate Petitioner's Suicide Attempt

Petitioner argues that his trial attorney's failure to investigate petitioner's suicide attempt and its implications for petitioner's final police interview[3]—in which he changed his story and admitted arguing with petitioner immediately before her death as well the presence of a gun—constituted ineffective assistance of counsel. Petitioner alleges that his attorney believed "it was necessary to look into the suicide [attempt], but he never did." ECF No. 1 at 23. Petitioner attaches a jail-incident report to his petition that describes the suicide attempt. *Id.* at 27.

Petitioner's second claim fails for the same reason as the first: He cannot establish prejudice. Petitioner fails to explain—or even speculate—what would have happened differently if his attorney had investigated the suicide attempt. But even if he had, it is difficult to understand how a suicide attempt on June 23, 2012, bears on the final interview he had with police on approximately May 7, 2012.

### III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order

---

[3] As summarized in the Court of Appeal's statement of facts, petitioner's initial police interview occurred soon after petitioner was taken into custody on May 5, 2012. *See* 14-10 at 4. The final interview occurred on approximately May 7, 2012. ECF No. 14-1 at 59.

adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, the court should decline to issue a certificate of appealability.

## IV.     Findings and Recommendations

We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability.

These findings and recommendations are submitted to the U.S. District Court Judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The District Judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:     July 16, 2019                              _____
                                                              UNITED STATES MAGISTRATE JUDGE